Thomas Leon **HARRIS**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. F–76–488.

Court of Criminal Appeals of Oklahoma.

Oct. 5, 1976.

Rehearing Denied Oct. 19, 1976.

Thomas W. Burns, Public Defender, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Judge.

The appellant, Thomas Leon Harris, Jr., hereinafter referred to as the defendant, was charged in the District Court, Tulsa County, Case No. CRF–73–228, with the offense of Robbery With Firearms, in violation 21 O.S.1971, § 801. He was tried by jury, convicted and sentenced to serve a term of thirty (30) years in the custody of the State of Oklahoma Department of Corrections at McAlester, Oklahoma. The defendant was granted post-conviction relief, and a new judgment and sentence was issued. From said judgment and sentence, the defendant has perfected his timely appeal to this Court.

The case was called for trial, and at that time a hearing was held on the defendant's

motion to dismiss on the grounds that the defendant had been previously convicted in CRF–73–227, of felony murder, arising out of the same allegations present at the case at bar, and that to proceed would violate the defendant's right not to be placed twice in jeopardy. The motion was overruled and the trial continued.

The State's first witness, Stephen Tolley, testified that he was familiar with the Quik-Trip store located at the 4600 block North Lewis in Tulsa, Oklahoma, in a predominantly black area, and that on July 21, 1971, between 2:00 and 3:00 a.m., he passed by the store on his way home from work. He stated that he observed a white automobile, with its motor running and its lights off, parked beside the Quik-Trip store, and saw a black man walking toward the store. Mr. Tolley was unable to identify the man, and he could not state with certainty whether there was any one else in the automobile.

The State's next witness was John Robert Scott, who testified that on July 21, 1971, he was the district supervisor for Quik-Trip stores in Tulsa. He testified that in the early morning hours of the 21st of July, 1971 he was summoned to the Quik-Trip store located at the 4600 block of North Lewis. Upon arriving at the store he saw an ambulance and police cars outside the store and found the interior of the store in a state of disarray. Mr. Scott further testified that he observed a red substance on the floor of the back room. The witness stated that he had audited the said Quik-Trip store subsequent to the 21st day of July, 1971, and had determined that $80.00 was missing from the cash register. Mr. Scott testified on cross-examination that the Quik-Trip Corporation had offered a $5,000.00 reward for information leading to the arrest or conviction of anyone connected with the incident, but was unable to state whether such money was ever paid.

The State called as its next witness Officer Roy Goodenough. The officer testi-fied that he had been employed as a police officer for the City of Tulsa for 11 years and was assigned to the identification division. Officer Goodenough was offered as an expert witness in the area of recovering latent fingerprints, and was accepted without objection. The officer stated that on July 21, 1971, at about 3:30 a.m., he was called to process the scene of an armed robbery at the Quik-Trip store on North Lewis. He substantially corroborated the testimony of Mr. Scott as to the appearance of the store, and went on to explain that he had photographed the store (State's Exhibits 1–11) and had taken latent fingerprints from articles in the store, including the cash register (State's Exhibit 12).

Officer Roy Nuttall, also a police officer for the City of Tulsa, was the next witness called for the State. Officer Nuttall was also assigned to the identification division, and was offered to the court as an expert witness in the field of identifying known prints with unknown prints, and was accepted without objection. The officer then identified State's Exhibit No. 13, as a fingerprint card containing 10 rolled and 10 plain impressions of the defendant's fingerprints, and was able to further identify a thumb print made by the defendant which was recovered from the Quik-Trip store.

The State's next witness was Officer Robert Maras, another police officer for the City of Tulsa. The officer stated that he was dispatched to the Quik-Trip store on North Lewis at approximately 3:30 a.m. on July 21, 1971. Upon entering the store, the officer found the scene in disarray and found the employee Mr. Baker, gasping for air with a hole in the center of his forehead from which blood was flowing. Officer Maras further testified that subsequent to his arrival at the store, several other officers, including Officer Goodenough, arrived and proceeded to process the scene.

The next witness for the State was Debra Avance. She testified that she knew the defendant, and that on July 21, 1971,

he was present at her house at approximately midnight or 12:30 a.m., along with her husband Reginald Avance, Floyd Harris, Michael Booker, Reginald Henderson, and Willie Horn. She stated that she overheard a conversation in which Floyd Harris said "something about robbing a store," and that he had a gun in his possession. She did not see a gun in the defendant's possession nor did the defendant say anything. Mrs. Avance testified that all the men, except her husband, left the house about 1:30 a.m. She stated that Thomas Harris, Michael Booker, Reginald Henderson, and Floyd Harris returned an hour or an hour and a half later, and proceeded to have another conversation with her husband. The witness stated that she heard Floyd Harris say that "he had to shoot the man so he wouldn't identify him," and Thomas Harris said that "he turned the cash register over trying to get the money out and spilled the change all over the floor." (Tr. 207, 208). Mrs. Avance stated that she had been convicted of tampering with United States mail and of two counts of forgery. She also stated that she was aware that a $5,000.00 reward had been offered in connection with the case.

The State next called her husband, Reginald Brook Avance, as a witness. He testified that he knew the defendant, and that they had been together on July 21, 1971, at his wife Debra's house, along with Willie Horn, Michael Booker, Reginald Henderson, Floyd Harris, and Debra Avance. Mr. Avance testified that the defendant first came up with the idea of robbing a store saying, "he'd been by the store before and it was a bunch of money there." The defendant also stated "he thought it was a good idea to go rob it." (Tr. 234, 235) The witness stated that all the men, except himself and Willie Horn, left the house about 1:30 a.m., and that Floyd Harris had a gun in his possession.

The witness further testified that the men returned to his house approximately an hour later and got him out of bed to tell him about a robbery they had committed. He stated that Floyd Harris admitted "shooting the dude," and that the defendant described opening the cash register.

Mr. Avance testified that he was in the State penitentiary serving time for robbery by force and fear, purse snatching, burglary, and forgery, when he first notified the Tulsa District Attorney in December of 1972, that he had information regarding July 21, 1971. The witness stated further that he had not been promised anything by the District Attorney's office in return for testifying in the case at bar, nor was he aware of the reward offered in connection with this case at the time he informed the District Attorney's office of his information. He was, however, made aware of the reward at the time of the defendant's arrest.

The next witness for the State was Michael Booker. He testified that he knew the defendant and had occasion to be with him on July 21, 1971, at the Avance residence. He stated further that he and the defendant along with Reginald Henderson and Floyd Harris, left the Avance residence at approximately 2:00 or 2:30 a.m. in a white automobile and went to 4600 and Lewis. The witness testified that when he parked the car leaving the motor running beside the store, Floyd Harris and the defendant got out and went into the store. He further testified that Floyd and the defendant were gone about 10 minutes and upon returning, Floyd stated "I had to shoot the dude." The four men then returned to the Avance residence. Mr. Booker stated that he was presently in jail for robbery but that he had not been granted immunity from prosecution for testifying in the case at bar, nor had the District Attorney's office promised him anything. He was aware of the reward offered in connection with this case but had not been promised any of the money in return for testifying.

The final witness for the State was Reginald Smith Henderson. He substantially corroborated the testimony of Michael Booker, regarding the details of the inci-

dent, and stated that the defendant had said "he had trouble getting the cash register open."

The State rested its case.

The defense called as its first witness Charles Corey, who testified that he had gone to the Quick-Trip store on North Lewis on July 21, 1971, at approximately 3:00 a.m. and then again about 3:30 a.m. He stated that he had noticed nothing unusual about the store. He testified that the employee appeared to be in good health on both occasions.

The next witness for the defense was Carolyn Harvey. She testified that during the latter part of July, 1971, a party was held at her parent's house which the defendant attended. She stated that he did not leave the party until the morning of the next day.

The next witness called by the defense was Helen Louise Abraham. She substantially corroborated Carolyn Harvey's testimony concerning the party in the latter part of July 1971, at which the defendant was in attendance. Neither she nor Carolyn Harvey affirmatively stated that the defendant was with them in the early morning hours of July 21, 1971.

The final witness for the defense was Thomas Leon Harris, Jr., who testified in his own behalf. Mr. Harris denied that he had been at the Avance's house on July 21, 1971, and he testified that he had attended a birthday party on the 20th day of July which lasted until the morning of the 21st. He further testified that he had never been in the Quik-Trip store on North Lewis, and alleged that the officers who identified his thumb print found in the Quik-Trip had made a mistake.

The defense then rested.

The defendant asserts as his first assignment of error, that his trial and conviction of robbery with firearms violates his right not to be twice placed in jeopardy, because he had been prosecuted and convicted of felony murder arising out of the same transaction. We do not agree.

The issue of double jeopardy has been considered by this Court on numerous occasions. It should be remembered that the prohibition against double jeopardy is intended to protect a person from being repeatedly prosecuted for the same offense until a conviction is obtained. As we held in *Hill v. State,* Okl.Cr., 511 P.2d 604 (1973):

" . . . It [prohibition against twice jeopardy] was not intended as a method of carte blanche extending to the accused the prerogative of committing as many offenses as he desired within the same transaction with the protective shield of permitting only one prosecution to arise and be pursued from that transaction."

In testing a plea of former jeopardy, it is to be considered first, whether the two offenses charged are in law and fact the same identical offense and second, whether the same testimony will support both charges. Offenses are not identical if, in the trial of one, proof of an additional distinct fact is required that is not necessary to prove in the trial of the other, although, some acts may be proved in both trials. *Branch v. Mills,* Okl.Cr., 500 P.2d 590 (1972), and *Stockton v. State,* Okl.Cr., 509 P.2d 153 (1973).

In the case at bar the two offenses complained of, felony murder, and robbery with firearms, are separate and distinct. The essential elements of robbery with firearms are: a wrongful taking of personal property in the possession of another from his person or presence against his will, by means of force or fear, and with the use of firearms. See, 21 O.S. 1971, § 801. The defendant was also convicted of murder, the elements of which are: homicide accompanied by a premeditated design to effect the death of the person killed, or homicide perpetrated by a person engaged in the commission of any felony. See, 21 O.S.1971, § 701.

In a felony murder case, the proof of the underlying felony is needed to prove

the intent necessary for a felony murder conviction. In a robbery with firearms case, no proof of killing is required. Thus, the evidence needed to support the defendant's conviction for robbery with firearms was not sufficient to convict him of a felony murder.

■ An examination of similar cases from our sister states fortifies our holding that an individual may be separately prosecuted and convicted for felony murder and the underlying felony which is the basis for the felony murder.[1] Particularly persuasive is the New York decision as our homicide murder statute was patterned after New York's homicide murder statute.[2] See *Tarter v. State,* Okl.Cr., 359 P.2d 596 (1961), citing *Jewell v. Territory,* 4 Okl. 53, 43 P. 1075 (1896). A later expression on this area of law is made by the New York Court in *Sandfield v. Goldstein,* 33 A.D.2d 376, 308 N.Y.S.2d 25 (1970). In that case the defendant had been charged in one of four counts of the indictment for felony murder. The defendant made a motion to dismiss upon the basis that the indictment had not specifically charged the felony underlying the murder, i. e., robbery. The court, citing with approval several cases including *Santangelo v. Tutuska,* supra, held that in a felony murder case the underlying felony is a substantial and generically separate and disconnected offense. The robbery is a distinct offense and is not part of the crime of homicide nor is it an included crime. The theory of law is that the intent to commit the underlying felony is transferred to the homicide even though the felon does not intend to cause the death of anyone.

■ Therefore, in the instant case, the defendant's claim of former jeopardy cannot be sustained. The defendant's previous conviction of felony murder does not bar his subsequent prosecution and conviction for the underlying felony of robbery with firearms.

In his second assignment of error, the defendant contends that allowing the prosecutor to define reasonable doubt in his closing argument, he thereby created prejudice in the minds of the jury. The prosecutor defined reasonable doubt as "what intelligent people call common sense." (Tr. 361) An admonishment was requested by the defendant, to which the trial court responded: "The standard as set forth in the instructions, I think that would be sufficient." (Tr. 361)

In the case of *Gresham v. State,* Okl.Cr., 396 P.2d 374 (1964), this Court held that:

"  .  .  . it is error for the County Attorney to define or attempt to define 'reasonable doubt' when the Court has failed to define the same in its instructions  .  .  ."

■ In the case at bar, the trial court did define reasonable doubt in its instructions to the jury, and the defendant made no objections to the instructions given by the court. We believe that the trial court cured all error by reminding the jury to consider the definition as given in the instructions. As stated in *Murff v. State,* Okl.Cr., 379 P.2d 710 (1963):

"An admonition to a jury not to consider the remarks of counsel usually cures an error unless it is of such a nature as, after considering the evidence, appears to have determined the verdict."

See also *Ethridge v. State,* Okl.Cr., 418 P.2d 95 (1966).

The evidence is clearly overwhelming to convict the defendant, and no prejudice appears in the record.

1. See, *State v. Briggs,* 533 S.W.2d 290 (Tenn. 1976); *State v. Hicks,* 530 S.W.2d 396 (Mo. App.1976); *People v. Green,* 62 Ill.2d 146, 340 N.E.2d 9 (1975, rehearing denied Jan. 22, 1976); and *People ex rel. Santangelo v. Tutuska,* 19 Misc.2d 308, 192 N.Y.S.2d 350, affirmed 11 A.D.2d 906, 205 N.Y.S.2d 1006.

2. Compare 21 O.S.1971, § 701 and New York Penal Laws of 1909 § 1044, repealed by Penal Law § 500.05, effective September 1, 1967; now Penal Law §§ 125.25, 125.27.

This brings us to a consideration of the defendant's third assignment of error, that the court allowed the State in closing argument to make reference to matters not properly in evidence which were highly prejudicial to his case.

The statements by the prosecutor, to which the defendant objects, appeared in the record (Tr. 362):

". . . State's Exhibits 14 and 15 were presented to Mr. Mike Hackett in his and his client's, Tom Harris—

"MR. HACKETT: Move for a mistrial.

"THE COURT: Overruled.

"MR. HACKETT: Exception.

"MR. HOPPER: —so they could send it off to an expert, so they could sent if off to the F.B.I. to prove that Mr. Nuttall and Mr. Goodenough were wrong, but the only one you heard testify that Mr. Goodenough and Mr. Nuttall were wrong was Mr. Hackett."

This Court has on many occasions considered the liberal range of discussion allowed to both the counsel for the State and the defendant. As stated in *Harvell v. State,* Okl.Cr., 395 P.2d 331 (1964):

"The right of argument contemplates a liberal freedom of speech, and the range of discussion, illustration and argumentation is wide."

This Court has also recognized that the prosecutor must stay within the bounds of the evidence before the jury, and not inject prejudicial statements. *Boyd v. State,* Okl.Cr., 478 P.2d 980 (1970). However, in order to raise such objections, the defense counsel must not only object to the remarks complained about, but request the court to admonish the jury not to consider them. This Court in *Disheroon v. State,* Okl.Cr., 357 P.2d 236 (1960) cited with approval *Hathcox v. State,* 94 Okl.Cr. 110, 230 P.2d 927 (1951) as follows:

" 'Counsel for a defendant must not only object to alleged improper statements of the county attorney in his argument to the jury, but he must go further and move the court to exclude such remarks from the jury and instruct them not to consider them for any purpose, unless the remarks were of such a character that the error would not be cured by a withdrawal of the remarks.

" 'Ordinarily error cannot be predicated upon mere unexplained excerpts from the remarks of counsel to the jury. Enough must appear of record to advise the appellate court of what preceded the alleged objectionable remarks and their meaning to be deduced from the context, and whether or not they were invited or provoked by remarks made by opposing counsel.' "

Also see, *Kern v. State,* Okl.Cr., 522 P.2d 644 (1974).

The statements by the prosecutor were made in response to remarks made by the defense counsel in his closing remarks, regarding the expertise of the two officers who lifted and identified the fingerprints of the defendant. Furthermore, in the instant case the comments made by the prosecutor were not sufficiently prejudicial to affect the jury's verdict. In *Gant v. Raines,* Okl.Cr., 377 P.2d 603 (1963), this Court held:

". . . unless such argument, in view of the entire record, affected defendant's substantial rights, or caused bias or prejudice against him in the minds of the jury, the conviction will not be reversed for that reason . . . The evidence of guilt was so clear and convincing that if no argument had been made on either side the result would have been the same." (Citations omitted)

The defendant's failure to request that the jury be admonished to disregard the remarks made in the prosecutor's closing argument, the lack of prejudice created

by such remarks, and the clear and convincing evidence presented at trial, require that the defendant's last assignment of error be disregarded.

For all of the above and foregoing reasons, we are of the opinion that the judgment and sentence appealed from should be and the same is hereby, *AFFIRMED*.

BRETT, P. J., dissents.

BLISS, J., concurs.

BRETT, Presiding Judge (dissents).

I dissent to this decision because it further erodes the protections against double jeopardy found in the Fifth Amendment to the United States Constitution and also the Oklahoma Constitution. In addition, this decision completely disregards the provisions of 21 O.S.1971, § 11. However, it has already been said by others that the majority of this Court has heretofore obliterated the provisions of the foregoing section of the statutes by judicial legislation.

As I view the provisions of 21 O.S.1971, § 701, para. 3, the intent to commit an armed robbery, during which a homicide occurs supplants the "premeditation" otherwise required to prove murder. In that case, all that is required is proof of the armed robbery and proof of the homicide. In that instance, the armed robbery becomes an integral part of the murder charge. Hence, I can see no legal justification for separating the two crimes for purposes of additional prosecution. In addition, besides the element of jeopardy, there is an element of economics involved. The expense of additional trials, after the maximum penalty has been imposed should be of some concern.

Insofar as I dissented to the majority decisions in *Hill v. State,* supra, *Branch v. Mills,* supra, and *Stockton v. State,* supra, which form the basis for this majority decision, I see nothing new to cause me to change my position at this time.